## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-CR-00194 (BAH)** |
| | : | |
| **MARVIN MARTIN,** | | |
| | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits this Memorandum in Aid of Sentencing.

The Defendant purchased massive quantities of the synthetic drug, N,N Dimethylpentylone also known as "boot" that was imported from China, and distributed it throughout the Washington, D.C. area for several years.

For his conduct and pursuant to the Presentence Investigations Report Guidelines calculations of 135 to 168 months, the government requests the Court to sentence the Defendant to 144 months of imprisonment followed by three years of supervised release. In support thereof, the government respectfully submits the following:

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural History

On April 23, 2024, the Defendant was indicted on one count of Attempted Possession with Intent to Distribute N,N Dimethylpentylone, a synthetic cathinone controlled substance.   On October 25, 2024, the Defendant rejected the government's plea offer and a *Lafler/Frye* hearing was conducted.   Trial was first set for March 24, 2025 and later continued to Monday, July 14,

2025.  On Friday, July 11, 2025, the Defendant pleaded guilty to the Indictment.  The matter now comes before the Court for sentencing on October 17, 2025.

### B.  The Defendant's Conduct

On March 7, 2024, the Defendant attempted to take possession of 10 kilograms of N,N Dimethylpentylone that was imported from China through Los Angeles Airport.  The package was intercepted by Customs and Border Protection at the Los Angeles Airport and transferred to Homeland Security Investigations in D.C.  HSI agents swapped out the real drugs with sham material and made a controlled delivery to 66 58th Street SE, Washington, D.C., where the Defendant was waiting to take possession of the package, that was addressed to "Martin Hall". The Defendant did not live at the address on 58th Street SE and used that address as a pickup point for his drugs.  By taking possession of the box of drugs, the Defendant intended to sell the drugs known as boot—a synthetic drug that is similar to "molly" or MDMA.  After he picked up the box, the Defendant fled law enforcement three times, from two different vehicles, and caused property damage to his own car and other people's property.  In jail recordings, the Defendant complained that he lost $40,000 to $50,000 worth of drugs after he realized that he received fake drugs.

### C.  The Defendant's Uncharged Conduct

Since at least 2020, until the time of his arrest in April 2024, the Defendant sold boot and other narcotics in the Washington, D.C. area.  The Defendant's receipt of imported boot from China on March 7, 2024, was part of a repeat pattern.  As evidenced from his phone, he has been selling boot for several years leading to his arrest.  The government is aware of at least one other time that the Defendant directly received imported boot from China.  On February 14, 2023, approximately 15 kilograms of N,N Dimethylpentylone was delivered to an address on 51st Street SE in Washington, D.C.  An individual, W-1, reported the package to law enforcement and law

enforcement seized the package.  The contents were later tested and confirmed to be N,N Dimethylpentylone.  W-1 reported that on February 14, 2023, UPS delivered a package to W-1's address at 51st Street SE, addressed to a "Mark Hall".  W-1, out of curiosity, opened the box, believed the contents to be drugs and reported it to law enforcement.  The next day, around 5:30 a.m., people arrived at his address and attempted to enter.  At 8:30 a.m. that same morning, W-1 observed the Defendant arrive in a silver Toyota Camry with "mirror tints" and asked W-1 if W-1 had seen his "stuff" and that he "can't lose [his] boot."  The Defendant then looked around W-1's yard and found the silver packaging that the drugs were packaged in and stated that he knew the box was there.  The Defendant and others then went inside W-1's home looking for the drugs, at one point even offering to pay W-1 for the box of drugs.  W-1 identified the individual as the Defendant, Marvin Martin, who came looking for the 15 kilograms of boot.  See Attachment A (MPD Report, Detective Notes, Photo ID by W-1, Lab Report).  Below are photos taken by law enforcement of the February 2023 package containing 15 kilograms of boot.





While the government did not charge this prior February 2023 15 kilograms of boot and is not seeking additional weight under the Sentencing Guidelines as relevant conduct drug weight under U.S.S.G. §§1B1.3 and 2D1.1, "long-standing precedents of the Supreme Court and this Court establish that a sentencing judge may consider uncharged or even acquitted conduct in calculating an appropriate sentence, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Settles*, 530 F.3d 920, 923 (DC Cir. 2008).  The similarities between the March 7, 2024 box which the Defendant had pleaded guilty to and the February 2023 box are striking: both were addressed to a variation of "Mark Hall" and "Martin Hall"; 51st Street SE and 58th Street SE are within blocks of each other; both boxes originated from China; both boxes contained boot with the same brown crystal-like characteristics; both packages tested positive for N,N Dimethylpentylone; both were packaged in clear bags within silver mylar packaging; and both were shipped by UPS.  W-1 also identified the Defendant as the person who came to his house looking for the box and is familiar with the Defendant as someone he knows from the neighborhood.  He also identified the Defendant driving the same silver Toyota Camry with heavily tinted windows—the same car the Defendant drove on March 7, 2024, when he went to 58th Street SE to pick up the box of boot in the instant case.

The Defendant's phone also revealed direct evidence of continued boot distribution since as early as 2020.  The delivery in March 2024 was not an isolated occurrence.  Indeed, the Defendant is a longtime boot dealer and only stopped upon his arrest in April 2024.  Messages from the Defendant's phones show his distribution of boot going back to 2020.

**Local User <fs-full.zip>**  ↗ Sent
4/7/2020 4:46:57.000 PM
I talked to him yesterday, I don't got no tree, just boot

**+12025348697**  ✓ Received
4/7/2020 4:56:42.000 PM
I know I may need that.

**+12025348697**  ✓ Received
4/7/2020 4:57:00.000 PM
I got you I been getting it gone .

**+12025348697**  ✓ Received
4/8/2020 3:15:32.000 PM
What it do what time are you coming out bro

**+12025348697**  ✓ Received
4/8/2020 8:14:18.000 PM
Here in the spot

**Local User <fs-full.zip>**  ↗ Sent
4/8/2020 10:23:28.000 PM
Wya

Local User <fs-full.zip>    ↗ Sent
7/10/2020 5:48:27.000 PM
Boot

+12025393820    ✓ Received
7/10/2020 5:48:40.000 PM
Yea

Local User <fs-full.zip>    ↗ Sent
7/10/2020 5:51:39.000 PM
711

+12025393820    ✓ Received
7/10/2020 6:36:57.000 PM
Mybad my cousin trying to get some

+12025393820    ✓ Received
7/13/2020 3:58:36.000 PM
Bruh

Local User <fs-full.zip>    ↗ Sent
7/13/2020 3:59:42.000 PM
Only boot

**Local User <fs-full.zip>**  ↗ Sent  7/12/2020 8:20:50.000 PM
I'm n the house

**+12026077573**  ✓ Received  7/14/2020 11:05:10.000 PM
No gas

**Local User <fs-full.zip>**  ↗ Sent  7/14/2020 11:05:17.000 PM
Just boot

**Local User <fs-full.zip>**  ↗ Sent  7/22/2020 12:28:31.000 AM
Marvo- new number

**+12026077573**  ✓ Received  7/22/2020 12:32:45.000 AM
Ard bet

**+12026077573**  ✓ Received  7/22/2020 3:27:32.000 PM
Yoo mo gas

**Local User <fs-full.zip>**  ↗ Sent  7/22/2020 3:29:26.000 PM
Just boot

**Local User <fs-full.zip>**
↗ Sent
1/28/2022 4:30:31.000 PM
White boot

**Tre 57 (+12403929814)**
✓ Received
1/28/2022 4:31:04.000 PM
Who this

**Local User <fs-full.zip>**
↗ Sent
1/28/2022 4:31:12.000 PM
Marvo

**Local User <fs-full.zip>**
↗ Sent
1/28/2022 4:31:18.000 PM
New number

**Local User <fs-full.zip>**
↗ Sent
1/28/2022 4:31:22.000 PM
I'm Uptop

**Tre 57 (+12403929814)**
✓ Received
1/28/2022 4:31:39.000 PM
I'm around the way

**+12023007362**                                    ✓ Received
                                        3/4/2022 9:35:43.000 PM
This Fred you good with the ==boot==

**Local User <fs-full.zip>**                         ↗ Sent
                                        3/4/2022 9:59:49.000 PM
Yeh

**+12023007362**                                    ✓ Received
                                        3/4/2022 10:00:33.000 PM
WYA

**Local User <fs-full.zip>**                         ↗ Sent
                                        3/4/2022 10:00:39.000 PM
58

**+12023007362**                                    ✓ Received
                                        3/4/2022 10:01:49.000 PM
How long u be around there

**Local User <fs-full.zip>**                         ↗ Sent
                                        3/4/2022 10:02:08.000 PM
Let me know wen u ready n I'll let u know where I'm at

**Local User <fs-full.zip>**    ↗ Sent
4/2/2022 12:22:09.000 AM
No boot

**Tre (+12029312009)**    ✓ Received
4/2/2022 12:22:40.000 AM
Damn

**Local User <fs-full.zip>**    ↗ Sent
4/6/2022 12:07:02.000 AM
Got boot

**Tre (+12029312009)**    ✓ Received
4/6/2022 1:14:19.000 AM
Bet

**Local User <fs-full.zip>**    ↗ Sent
4/6/2022 1:17:44.000 AM
Not to much, might run out soon

**Tre (+12029312009)**    ✓ Received
4/6/2022 1:18:33.000 AM
Damn Brody u running out quick these days

Even after he realized he received fake drugs following the controlled delivery on March 4, 2024, and despite his successful evasion from law enforcement that day, the Defendant, undeterred, acquired additional boot on March 13, 2024.  On March 13, he texted numerous people that he was back with the "brown boot" and attached videos of the boot he just acquired.

 

## II.    CALCULATION OF SENTENCING GUIDELINES

The Government concurs with the Pre-Sentence Report calculation that the Defendant's base offense level is 32, with a two-point enhancement for reckless endangerment, and a two-point

deduction for acceptance of responsibility.  The Government also concurs that the Defendant is not eligible for a zero-point offender adjustment.  Thus, based upon the final PSR released on September 25, 2025, the resultant total offense level of 32, along with a Criminal History Category of II, results in a corresponding range of imprisonment under the Guidelines of 135 months to 168 months.

Adjustment for Obstruction (Reckless Endangerment During Flight), U.S.S.G. §3C1.2

On March 7, 2024, the Defendant fled three times from law enforcement after he took possession of the drugs.  The first flight began at approximately 12:37 p.m., after the Defendant discarded the empty cardboard box in the residential trash bin and agents encountered him driving towards them in his Camry in the same neighborhood.  Agents activated their emergency lights in an attempt to detain the Defendant. The Defendant stopped, reversed his vehicle, and then drove forward at a high rate of speed around a law enforcement vehicle, narrowly avoiding a collision. The Defendant continued at a high rate of speed, crashing into a minivan, and then a nearby fence of a residence while fleeing the area. Photos taken from the scene of the crash in the residential neighborhood demonstrate the severity of the crash. In this flight, the Defendant drove at such a high rate of speed that he struck the minivan with enough force that it left debris in the middle of the road.  Furthermore, as a result of the flight, he struck a resident's fence, causing significant damage to the fence and leaving his own bumper behind, as pictured below.  The damage to the Camry alone, also pictured below, demonstrates the Defendant's speed and recklessness as he fled law enforcement during the first flight on March 7.











The second flight on March 7 happened at approximately 1:28 p.m., when the Defendant departed his Lanham, MD address. An HSI special agent driving an unmarked law enforcement vehicle activated his emergency vehicle lights and maneuvered his vehicle in an attempt to block the Defendant. The Defendant then accelerated his Camry towards the agent, striking the front side of the agent's vehicle while fleeing the area at a high rate of speed. Here, the damage to the agent's car was minor, and it is possible that the Defendant's Camry sustained no visible damage. Photo of the agent's car is pictured below.



The third and final flight occurred at approximately 2:15 p.m. on March 7. As additional agents arrived to set up a perimeter on the Lanham address in anticipation of obtaining a search warrant, officers observed the Defendant on foot moving from the rear of the house towards a Mercedes AMG vehicle parked in the driveway. As agents observed the Defendant entering the Mercedes and maneuvered their vehicles to block the street, the Defendant drove towards the agents' vehicles at a high rate of speed. As the entire roadway was blocked by law enforcement vehicles, the Defendant swerved off of the roadway and accelerated onto the sidewalk, hitting a tree while bypassing agents' vehicles and again fleeing the area. The Defendant disputes that he hit a tree with his Mercedes during his flight, however and notwithstanding that agents observed him do this, photographs taken from the scene shows damage consistent with a vehicle driving onto the sideway and scraping the wall and tree as it squeezed through. Moreover, law enforcement surveilled the Defendant's Mercedes at a body shop shortly after the controlled delivery and obtained the receipt from the body shop documenting the repair on the Mercedes. Finally, the Defendant himself admitted in a recorded jail call that his Mercedes (the "Batmobile") was in the shop and that he had to drive a Zip[1] rental car for $80 a day. Below are photos taken

---

[1] https://www.zipcar.com

by law enforcement of the Mercedes at an auto repair shop after the controlled delivery, and the

receipt from the repair shop for the 2023 Mercedes E63, dated March 8, 2024.







In a March 14, 2024, recorded call to the Defendant from BOP inmate KW, the Defendant

states his "Batmobile" is in the "cut" and as a result, he's driving a Zip rental car.

11:05
KW: Are you in the Batmobile?
MM: Nah, that joint in the cut. I'm in the, I told you already.
KW: Oh yeah zippity zip
MM: I'm in the zippity zip, $80 a day.

Below are photos showing the damage to the tree and wall that the Defendant hit when he went up on the sidewalk and fled for the third time on March 7, 2024.  See also Attachment B (ECF 1, Sworn Complaint, page 2, detailing the impacts).







Defendant argues that his flight was merely "instinctive" and ignores the rest of the evidence showing the actual damage and risk the Defendant's actions created on March 7, 2024. Defendant also denies knowing police was pursuing him during the first flight (resulting in the crash with the minivan) even though agents did activate their emergency lights. More telling however, is that the Defendant claims "he did not want to be arrested for fleeing the first time" but yet he also contends that "he did not realize it was the police and he drove out of the area to avoid being stopped, hurt, or robbed by other individuals." Defendant's PSR Objections. If he didn't realize the police tried to stop him in the first flight, why would he be afraid of being arrested by them for fleeing during the second and third flight? Contrary to his position now, the Defendant texted on March 10, 2024, that the police did try to "blitz" him *three* times that day.



The cases cited by the Defendant in his PSR Objections have also found the enhancement to apply when the "[defendant] fled the traffic stop while two officers were nearby interviewing the passenger of the vehicle. The officers were close enough that [the defendant's] car rolled over one officer's foot when he suddenly pulled away. The danger that [the defendant's] flight created at that moment alone satisfied § 3C1.2's "substantial risk" standard…It makes no difference that

the officer was uninjured... his reckless flight nonetheless dramatically increased the risk of far more serious harm." *United States v. Burnley*, 988 F.3d 184, 191 (4th Cir. 2021).  *See also United States v. Bouler*, 351 F. App'x 822, 824 (4th Cir. 2009) ("A defendant fleeing from police by car, striking two vehicles en route, creates an obvious risk that a traffic accident may occur and cause serious bodily injury.").

Likewise, in *United States v. Dennings*, 922 F.3d 232 (4th Cir. 2019), also cited by the Defendant, the court rejected the defendant's argument that it was merely an "instinctive flight." *Id*. at 238.  "[The defendant's] conduct created a substantial risk of death or serious bodily injury as required for § 3C1.2 to apply. [E]ndangering others during flight or in the course of resisting arrest involves active, willful behavior; in contrast, mere flight or disagreeableness during an encounter involves more passive or instinctive conduct. Here, while armed, [the defendant] ignored repeated instructions from the officer to stop. As he did so, his right arm and hand were moving in a way that suggested he had or was reaching for something." *Id*. (internal citations omitted).  *Contrast with United States v. Henderson*, 88 F.4th 534 (4th Cir. 2023) (finding that flight with a loaded firearm, without more, is not enough to warrant the application of § 3C1.2).

The Defendant did not simply flee out of instinct, nor did he flee not knowing law enforcement was pursuing him.  He fled purposely to evade arrest because he knew he had a significant quantity of drugs in his car.  In his determination to escape, he drove recklessly causing a collision with a civilian's minivan and a metal fence with so much force that it ripped off the Camry's bumper.  In doing so, the Defendant created a real risk of injury, as his flights were all in residential neighborhoods.  The Defendant continued to flee as he encountered law enforcement again later that day—for a second and third time—and grazed an agent's vehicle and struck a tree and wall before making good his escape. Certainly, the Court can reasonably conclude that the

Defendant's flight created a substantial risk of death or serious bodily injury to other civilians on the street as well as the agents pursuing him. *See United States v. Benson*, 1994 WL 245593 at *1 (D.C. Cir. 1994) (U.S.S.G. § 3C1.2 applies when the defendant led police "on a chase through the city streets of the District of Columbia that ended only when [the defendant's] car jumped a curb, crossed a sidewalk and came to rest against a boundary wall bordering the yard of a house.").

## III.    RECOMMENDATION

All the applicable factors set forth in Title 18, United States Code, Section 3553(a), should be considered by this Court. *See United States v. Gall*, 552 U.S. 38, 49-50 (2007). These factors include "the nature and circumstances of the offense and the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment (*id*. § 3553(a)(2)); the Sentencing Guidelines and related Sentencing Commission policy statements (*id*. § 3553(a)(4) and (a)(5)); and the need to avoid unwarranted sentence disparities (*id*. § 3553(a)(6)). The government's sentencing recommendation is based upon a review and balancing of these factors.

### A.  Nature and Circumstances of the Offense

Drug trafficking is undoubtedly serious and causes great harm to our community, and in this case, the Defendant directly or indirectly imported kilograms of a synthetic drug from China. Each time the Defendant acquired bulk quantities of boot, he distributed this synthetic drug across the region. By his own account, 10 kilograms of boot was worth $40,000 to $50,000. We also know from his text messages that he priced one "zip" or one gram of brown boot at $125 per gram,

27

and one gram of white boot at $175 per gram. With each 10-kilogram box of boot, he was able to sell up to 10,000 gram bags of boot, profiting from this synthetic designer drug that has been reported to cause high blood pressure, rapid heart rate, hyperthermia, dehydration, arrhythmias, hallucinations, loss of consciousness, and death.[2] [3] The Defendant not only knew that this synthetic cathinone was illegal, he monitored the news for seizures of dipentylone destined for the Washington, D.C. area. Specifically, on July 14, 2023, a coconspirator told him that the "mail…wasn't in" and the Defendant responded by sending him an article of the seizure of 70 pounds of boot by CBP at Dulles Airport on July 5, 2023. At the very least, the Defendant was interested in the illicit importation of boot by others, but more likely, he was working with "Mark Henry" to import the 70 pounds of seized boot in July 2023.

---

[2] https://www.cbp.gov/newsroom/local-media-release/dulles-cbp-officers-seize-70-pounds-dangerous-newer-cathinone-analogue
[3] https://nij.ojp.gov/library/publications/nn-dimethylpentylone-dipentylone-new-synthetic-cathinone-identified-postmortem



# CBP officers seize 70 pounds of dangerous synthetic drugs at Dulles Airport

By FOX 5 DC Digital Team | Published July 5, 2023 2:11pm EDT | News | FOX 5 DC



Image 1 of 4

**WASHINGTON** - Just over 70 pounds of a Chinese-made drug that has effects similar to amphetamines was intercepted by U.S. Customs and Border Protection officers at Washington Dulles International Airport.

Officers discovered the two boxes, which were labeled as beauty products from China and were destined for an address in D.C., on June 26. After taking a closer look at the shipment, the officers discovered multiple vacuum-sealed bags that contained a white, crystallized substance that was tested and later determined to be drugs.

## B.  History and Characteristics of the Defendant

The Defendant is a thirty-two-year-old man with repeated contacts with the criminal justice system.  He has past arrests for drug related offenses, theft, burglary, and assaultive conduct. He has a prior adult conviction for conspiracy to commit robbery which stems from robbing a woman he spent the night with in a hotel.  The Defendant's co-defendant in that robbery case held a gun to the victim's head while the two demanded money. The Defendant's arrest history shows an escalation of the drugs he sold: first marijuana at the age of 24, then cocaine base at the age of 25, and boot by the age of 28 (text messages show boot sales in 2020).  Despite multiple drug arrests, the Defendant continued to choose the easier (and more lucrative) way to make a living by selling

drugs.

### C.  Need for Deterrence

Drug dealing can be a deadly scourge, and synthetic drugs like boot have been on the rise in the District of Columbia thanks to people like the Defendant.  The need for deterrence is greater for higher-level distributors than it might be for street corner dealers.  As shown by the evidence in this case, the Defendant dealt in double digit kilograms of boot, which were shipped directly from the Chinese manufacturers.  The Defendant was not a low-level retail dealer, nor a middle-man redistributor; he was the first distributor in the supply chain to receive the drugs once it arrived in the United States.  For this reason alone, a sentence of 144 months is warranted to deter the Defendant from returning back to drug trafficking and to deter other high-level traffickers, while protecting the community from massive quantities of synthetic drugs pouring in.

## IV.    CONCLUSION

The government's request for 144 months of imprisonment followed by 3 years of supervised release is reasonable, serves the interests of justice and is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a).

Respectfully Submitted,

Jeanine Ferris Pirro
United States Attorney

By:    */s/ Iris McCranie*
Iris McCranie
Assistant U.S. Attorney
N.Y. Bar No. 5011234
United States Attorney's Office
601 D Street, NW
Washington, D.C. 20530
(202) 252-7828
iris.mccranie@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 3, 2025, a copy of the foregoing Memorandum was served on counsel for Defendant via the Court's electronic case filing system.

*/s/ Iris McCranie*
Iris McCranie
Assistant U.S. Attorney